UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | * | |
| | * | |
| v. | * | Criminal Action No. 1:21-cr-10195-IT |
| | * | |
| ANA CHECO, | * | |
| | * | |
| Defendant. | * | |

MEMORANDUM & ORDER

April 26, 2023

TALWANI, D.J.

Defendant Ana Checo is charged with possession with intent to distribute a controlled substance in violation of 21 U.S.C. § 841 and conspiracy to launder money in violation of 18 U.S.C. § 1956(h), and faces drug and money laundering forfeiture allegations under 21 U.S.C. § 853 and 18 U.S.C. § 982(a)(1), respectively. Indictment [Doc. No. 11]. Checo's pending Motion to Suppress Evidence [Doc. No. 52] contends that the government obtained search and tracking warrants without probable cause and seeks to exclude the evidence obtained in connection with those searches and any evidence derived therefrom. Checo's pending Motion to Suppress Statements [Doc. No. 53] contends that Checo did not knowingly waive her Miranda rights and seeks to exclude statements Checo made to law enforcement on July 17, 2019. The court addresses in turn Checo's challenges to the two applications for warrants and to Checo's statements and DENIES both motions.

I.      **July 1, 2019 Search and Tracking Warrants for the Location of Checo's Phone and Vehicle**

A.      *Factual Background*

1.      The Money Laundering Investigation

Agents in New Jersey began investigating a large-scale international money laundering organization in 2018. July 1, 2019 Jill Hardie Aff. ("First Hardie Aff.) ¶ 19 [Doc. No. 52-1]. A confidential source of information ("CS-1"), who had been charged with money laundering offenses and was cooperating in the hopes of receiving leniency at sentencing, provided agents with information, some of which was corroborated by other evidence and led to the seizure of drugs and drug proceeds. Id.

CS-1 was in contact with money brokers who act as liaisons between drug suppliers based in Central and/or South America and their drug customers in the United States. Id. at ¶ 20. The money brokers facilitate the laundering of drug proceeds from inside the United States to the drug suppliers located outside the United States. Id. The money laundering involves the retrieval of drug proceeds from drug distributors in the United States, which are then deposited into bank accounts and ultimately transferred to accounts controlled by the drug suppliers located outside the United States. Id. CS-1 received contracts for money pickups from money brokers. Id. Agents in Boston had conducted several money pickups contracted by CS-1 in and around Boston and had seized over 60 kilograms of fentanyl, as well as approximately $800,000, in connection with the pickups. Id.

2.      June 24, 2019 Money Pickup

On or about June 20, 2019, CS-1 received information from a money broker that a person wanted to drop off money in Boston for laundering. Id. at ¶ 21. That day, CS-1 provided the

money broker offering the contract the serial number for a $1 bill in the possession of a law enforcement agent; the serial number was to serve as a code at the time of the money pickup confirming that the person conducting the pickup was to receive the money on behalf of the money broker. Id.

On June 22, 2019, CS-1 was contacted by Checo who was using a cellphone with the phone number (978) 566-8189 ("Target Telephone"). Id. at ¶¶ 8, 22. Checo provided CS-1 with the confirmatory code via text message. Id. at ¶ 22. Checo further texted CS-1 from the Target Telephone, "58,500." Id. CS-1 and Checo agreed for the money pickup to take place the following Monday and, upon request, CS-1 texted the Target Telephone a shopping plaza in Medford, Massachusetts, as the pickup location. Id.

On June 24, 2019, during a telephone call (which was not recorded), Checo and CS-1 confirmed the timing and location of the money pickup. Id. at ¶ 23. CS-1 provided Checo with a description of the vehicle driven by an undercover law enforcement agent (the "UC"), who was posing as a money laundering associate of CS-1, and the UC's location. Id. Checo told CS-1 that she was driving a black car and confirmed that she was dropping off "58,500." Id.

At approximately 11:49 a.m. that day, DEA Agent Jill Hardie observed Checo driving a 2010 black Honda Accord ("Target Vehicle"), with an unidentified male passenger in the front passenger seat, up and down the row of parked cars in the parking lot of the prearranged meeting location. Id. at ¶¶ 13, 24.[1] Several minutes later, Checo parked the Target Vehicle next to the UC's car and approached the passenger side of the UC's vehicle and leaned inside the open window. Id. Checo confirmed the code on the $1 bill in the UC's possession via her cellular

---

[1] Agents identified Checo via a photograph on file with the Massachusetts Registry of Motor Vehicles. First Hardie Aff. ¶ 24 [Doc. No. 52-1].

telephone, took half of the dollar bill, and then instructed the UC to change locations within the parking lot, stating that she believed there were too many surveillance cameras in the location where the UC was positioned. Id. Checo reentered the Target Vehicle and drove to an adjacent area of the same shopping center. Id. The UC also repositioned his vehicle as instructed by Checo. Id.

Checo exited the Target Vehicle carrying a white plastic bag, opened the back passenger side door of the UC's vehicle, placed the white plastic bag in the back seat, and placed a pair of gym shorts from the UC's vehicle over top of the plastic bag. Id. at ¶ 25. Checo stated that it looked better with the gym shorts over top of the bag. Id.[2] Checo then reentered the driver's seat of the Target Vehicle and left the area. Id. The plastic bag Checo left in the UC's vehicle contained a "Little Bites" muffin box, which in turn contained $58,510. Id. at ¶ 26. The money ultimately was transferred to a bank account provided to CS-1 by the money broker who offered the contract. Id.

      3.     Application for the July 1, 2019 Search and Tracking Warrants for the Location of the Target Telephone and Target Vehicle

On July 1, 2019, the government applied for warrants for the location of the Target Telephone from its service provider, to employ an electronic investigative technique to determine the location of the Target Telephone ("cell-site simulator"), and authorizing DEA agents to install, maintain, and use for 45 days in the District of Massachusetts a real-time Global Positioning System ("GPS") mobile tracking device on the Target Vehicle. Id. at ¶¶ 8–10, 13. The application was accompanied by the affidavit of DEA Agent Jill Hardie. See First Hardie Aff. [Doc. No. 52-1].

---

[2] The interaction between Checo and the UC was audio- and video-recorded. Id. at ¶ 25.

4

That same day, a magistrate judge in the District of Massachusetts issued a precise location warrant and a cell-site simulator warrant for the Target Telephone for 30 days, and a tracking warrant for the Target Vehicle for 45 days. See Exs. B, C, & D, Warrants [Doc. Nos. 52-2, 52-3, 52-4].

B.    *Discussion*

Checo moves to suppress evidence obtained pursuant to the July 1, 2019 search and seizure and tracking warrants for the Target Telephone and Target Vehicle, respectively. See Mot. to Suppress Evidence [Doc. No. 52]. Checo primarily contends that the government's applications for both warrants fail to establish probable cause.

The Fourth Amendment to the United States Constitution provides that no warrants shall issue, but upon probable cause, supported by oath or affirmation, and particularly describing the place to be searched and the persons or things to be seized. U.S. Const. amend. IV. "'A warrant application must demonstrate probable cause to believe that (1) a crime has been committed— the "commission" element, and (2) enumerated evidence of the offense will be found at the place searched—the so-called "nexus" element.'" United States v. Dixon, 787 F.3d 55, 59 (1st Cir. 2015) (quoting United States v. Feliz, 182 F.3d 82, 86 (1st Cir. 1999)).

The probable cause inquiry is a "practical, common-sense one that takes into account the totality of the circumstances." Id. (internal quotation marks and citations omitted). In making the probable cause determination, the "issuing magistrate ordinarily considers only the facts set forth in supporting affidavits accompanying the warrant application." United States v. Zayas-Diaz, 95 F.3d 105, 111 (1st Cir. 1996). However, the probable cause showing "leaves ample room for reasonable inferences based on common experience: an affidavit submitted to show probable cause need not point to some straight-line connection but, rather, may rely on the affiant's

5

connecting of a series of dots in a commonsense way." United States v. Adams, 971 F.3d 22, 32 (1st Cir. 2020) (citing Florida v. Harris, 568 U.S. 237, 244 (2013)); see also id. ("A showing of probable cause may be premised on either direct or circumstantial evidence or some combination of the two"). A warrant application establishes probable cause for the commission element when the facts presented to the magistrate "warrant a man of reasonable caution" to believe a crime has been committed. Feliz, 182 F.3d at 86.

A reviewing court must examine the affidavit in support of the warrant in a "practical, commonsense fashion" and give "considerable deference" to the magistrate's finding that the information contained therein satisfied the probable cause showing. Id. (noting the focus is on "whether the magistrate had a substantial basis for concluding probable cause existed"). Reversal is appropriate only where a reviewing court sees "no substantial basis for concluding that probable cause existed." Dixon, 787 F.3d at 58–59 (quoting United States v. Ribeiro, 397 F.3d 43, 48 (1st Cir. 2005)). "[D]oubtful or marginal cases in this area should be largely determined by the preference to be accorded to warrants." United States v. Ventresca, 380 U.S. 102, 109 (1965).

To satisfy the nexus element a court need only find "fair probability—not certainty—that evidence of a crime will be found in a particular location based on the totality of circumstances." United States v. Lindsey, 3 F.4th 32, 39 (1st Cir. 2021) (internal quotation marks omitted). "The nexus between an alleged crime and the place searched may be 'inferred from the type of crime, the nature of the items sought, the extent of an opportunity for concealment and normal inferences as to where criminals would hide [evidence of a crime].'" Id. (quoting United States v. Rodrigue, 560 F.3d 29, 33 (1st Cir. 2009) (alteration in Rodrigue)). The nexus element may be satisfied even without direct evidence. See United States v. Gonzales-Arias, 946 F.3d 17, 24 (1st

Cir. 2019), cert. denied, 140 S.Ct. 2729 (2020) (concluding that probable cause may be found even if officers never spotted illicit objects at the scene).

Checo contends that the First Hardie Affidavit [Doc. No. 52-1] fails to establish probable cause that evidence of a crime would be found in the prospective location of the Target Telephone and Target Vehicle where Checo was involved in a single money drop-off and no facts indicate that Checo's criminal activity was ongoing. Mot. to Suppress Evidence 11, 13 [Doc. No. 52]. However, law enforcement encountered Chico's criminal activity in the context of an ongoing investigation into a large-scale organization laundering drug proceeds. Additionally, during the June 24, 2019 money drop-off of $58,510, Checo used a confirmation code system common among drug traffickers and money launderers and exhibited consideration of surveillance risks, which further supports a finding that Checo was not a one-time participant in the criminal activity.

Checo cites several cases for the assertion that "a single instance of prior criminal activity does not, without more, necessarily establish probable cause that evidence of a crime will be found in the place searched." Id. at 11. But the cases[3] she cites all relate to searches of a residence after a singular identification of drug-related criminal activity and the home "is

---

[3] United States v. Abernathy, 843 F.3d 243, 247–148 (6th Cir. 2016) (finding that "the marijuana roaches and T2–laced plastic bags the police recovered from [d]efendant's garbage were insufficient to create a fair probability that drugs would be found in [d]efendant's home"); United States v. Chalas, 478 F.Supp.3d 143, 151 (D. Mass. 2020) (finding no probable cause to search defendant's residence six weeks after evidence of drug transaction when there was no showing of protracted conduct or entrenched reputation); United States v. Grant, 108 F.Supp.2d 1172, 1175 (D. Kan. 2000) (finding no probable cause to search defendant's house based on one drug transaction at house six and one-half months prior to the search); United States v. Hython, 443 F.3d 480, 486 (6th Cir. 2006) (finding no probable cause to search the residence where the investigation consisted of one drug transaction implicating the location without providing information as to when the transaction took place).

shielded by the highest level of Fourth Amendment protection." Morse v. Cloutier, 869 F.3d 16, 23 (1st Cir. 2017). In Checo's case, the July 1, 2019 search and tracking warrants were for the location of the phone and vehicle, respectively, not the search of a home.

Checo further contends that the First Hardie Affidavit [Doc. No. 52-1] does not indicate that Checo was involved in drug trafficking and, thus, Agent Hardie's understanding of how drug traffickers utilize cell phones and cars to conduct business, as well as how tracking drug traffickers' vehicles would lead to evidence of criminal activity, is inapplicable to her. Mot. to Suppress Evidence 13 [Doc. No. 52]. The fact that CS-1 was in contact with money brokers who act as liaisons between drug suppliers, a money broker contacted CS-1 about a person wanting to drop off money for laundering, and Checo met with UC for the money drop-off supports a finding that Checo was involved with laundering drug proceeds. Moreover, Agent Hardie's definition of drug trafficking includes movement of the proceeds of drug trafficking among multiple participants, including the money launderers. See First Hardie Aff. ¶ 6 [Doc. No. 52-1]. Accordingly, Agent Hardie's understanding of how phones and cards are used in furtherance of drug trafficking applies to Checo's use of the Target Telephone and Target Vehicle.

Checo's next argument, that Agent Hardie's claims of how cell phones are used in drug trafficking relate only to communications on those cell phones, not location information, falls flat where the First Hardie Affidavit [Doc. No. 52-1] details how the Target Telephone's location information will assist in obtaining evidence of the crimes. The First Hardie Affidavit [Doc. No. 52-1] states that because "the Target Telephone is a cellular phone . . . likely to be carried on the person of the user," "obtaining information about the location of the Target Telephone" will "assist agents with locating [Checo], identifying her associates and locations she uses to receive and distribute narcotics and to store drug proceeds, conducting physical surveillance of [Checo]

and her criminal associates and perhaps seizing contraband such as drug or drug proceeds." <u>Id.</u> at ¶ 15. The court finds that probable cause exists that the location of the Target Telephone will lead to such information where in addition to Checo using the Target Telephone to communicate with CS-1 on June 22 and 24, 2019, Checo likely had the Target Telephone in her possession at the June 24, 2019 money drop-off as she was coordinating the drop off with CS-1 leading up to it. <u>See</u> <u>id.</u> ("[Checo] sent text messages from the Target Telephone to CS-1 updating CS-1 on her anticipated arrival time" on June 24, 2029).

Accordingly, the court finds that the July 1, 2019 search and tracking warrants were supported by probable cause that the location information of the Target Telephone and Target Vehicle, respectively, would result in evidence of criminal activity.

## II.      July 17, 2019 Search Warrant for Checo's Apartment

### A.      *Factual Background*

#### 1.      Surveillance from July 1, 2019, to July 17, 2019

In the afternoon or evening of July 1, 2019, a law enforcement agent observed Checo arrive at 311 Lowell Street, Andover, MA ("311 Lowell Street") driving the Target Vehicle. July 17, 2019 Jill Hardie Aff. ("Second Hardie Aff.") ¶¶ 18, 22 [Doc. No. 52-5]. Checo and a small female child exited the Target Vehicle and entered Building 2 at 311 Lowell Street ("Building 2"). <u>Id.</u> at ¶ 22. Checo's driver's license listed 311 Lowell Street, Andover, Massachusetts, as her residence, and the Target Vehicle was registered to Checo at 311 Lowell Street, Apartment 2211, Andover, Massachusetts 01810 (the "Target Location"). <u>Id.</u> at ¶ 24. Minutes later, the agent observed through the window of the Target Location that the lights, which had previously been dark, illuminated. <u>Id.</u> at ¶ 22. At that time, precise location information for the Target Telephone indicated that it was located at Building 2. <u>Id.</u>

Since obtaining the warrants on July 1, 2019, until July 17, 2019, precise location information for the Target Telephone showed that the Target Telephone was frequently located, including overnight hours, inside of Building 2. Id. at ¶ 20.

Between July 2 and 17, 2019, the GPS tracking device on the Target Vehicle showed that the Target Vehicle was frequently parked outside of Building 2, including during the overnight hours. Id. at ¶ 21.

In the two weeks prior to July 17, 2019, a law enforcement officer observed the Target Vehicle parked outside of Building 2 multiple times. Id.

In the week prior to July 17, 2019, a law enforcement agent observed Checo outside of Building 2. Id. at ¶ 23.

The Target Telephone was located overnight inside of Building 2 from July 16, 2019, to approximately 2:45 a.m. on July 17, 2019, when Checo left Building 2 and traveled to New York, New York. Id. at ¶ 20. According to precise location information for the Target Telephone, Checo arrived in the Bronx, New York, at approximately 6:00 a.m. in the morning, traveled to several neighborhoods in New York City, and returned to Massachusetts at approximately 11:56 a.m. Id. at ¶ 20 n.1.

2.      Application for the July 17, 2019 Search Warrant for the Target Location

On July 17, 2019, the government applied for a search warrant for the Target Location to seize all records from January 1, 2019, to July 17, 2019, and tangible objects that constitute evidence of violations of 21 U.S.C. § 841(a)(1) (possession with intent to distribute and distribution of controlled substances), 21 U.S.C. § 846 (conspiracy to possess with intent to distribute and to distribute a controlled substance), and 18 U.S.C. § 1956(h) (conspiracy to commit laundering). See Ex. B, Items to Be Seized, Second Hardie Aff. [Doc. No.52-5]. The

application was accompanied by a second affidavit from DEA Agent Jill Hardie. <u>See</u> Second Hardie Aff. [Doc. No. 52-5].

At 1:54 p.m., a magistrate judge in the District of Massachusetts found probable cause that evidence of drug trafficking and money laundering, including but not limited to records and telephones, would be found and signed the search and seizure warrant for the Target Location. <u>See</u> Ex. F, Warrant [Doc. Nos. 52-6].

At approximately 2:00 p.m., Agent Hardie notified officers on scene that she had obtained a search warrant for the apartment. Office James Hyde Aff. ("Hyde Aff.") ¶ 10 [Doc. No. 62-4]. At that time, agents and officers searched the Target Location for documents and records in accordance with the search warrant. <u>Id.</u> The return of the search warrant provides in relevant part that the following inventory of property that was taken:

- Blue LG cellphone labeled "978-566-819"

- Seven (7) brick shaped packages containing white power marked

- Three (3) brick shaped packages in black tape

- One (1) brick shaped package in brown tape

Return to Search and Seizure Warrant [Doc. No. 52-6].

    B.    *Discussion[4]*

      1.   <u>Franks</u> Hearing

Checo contends that a <u>Franks</u> hearing is warranted because the <u>Second Hardie Affidavit</u> [Doc. No. 52-5] recklessly or intentionally omitted that Checo did not go directly to the Target

---

[4] Where the court has found that the there was sufficient basis for a finding of probable cause as for the July 1, 2019 search and tracking warrants, the court does not address Checo's arguments that evidence unlawfully obtained pursuant to those warrants cannot be the basis for probable cause in the July 17, 2019 search warrant for the Target Location and that probable cause for the

Location after the June 24, 2019 money drop-off and this information was material because it weakens the nexus between Checo's alleged criminal activity and the Target Location. Def.'s Supp. Mem. 7–9 [Doc. No. 67].

A defendant seeking a <u>Franks</u> hearing "must make a 'substantial preliminary showing' that the affidavit included a false statement which was made either knowingly and intentionally or with reckless disregard for the truth, and that this misstatement was necessary to the finding of probable cause." <u>United States v. Nelson-Rodriguez</u>, 319 F.3d 12, 34 (1st Cir. 2003) (quoting <u>Franks</u>, 438 U.S. at 155–56). "A material omission in the affidavit may also qualify for a <u>Franks</u> hearing in place of a false direct statement, provided the same requisite showing is made." <u>Nelson-Rodriguez</u>, 319 F.3d at 34 (citing <u>United States v. Scalia</u>, 993 F.2d 984, 987 (1st Cir. 1993)).

The court finds that no <u>Franks</u> hearing is warranted on this issue. As Checo's counsel acknowledges, "[t]here is no indication in the affidavit that []Checo returned directly home from the money drop-off. In fact, the information in the affidavit indicates that she did not." Mot. to Suppress Evidence 16 [Doc. No. 52]. Agent Hardie's second affidavit states that Checo arrived at "approximately 11:49 a.m." at the June 24, 2019 money drop-off with an "unidentified male passenger." Second Hardie Aff. ¶ 16 [Doc. No. 52-5]. Then "[l]ater that afternoon, a law enforcement agent conducting surveillance outside the Target Location observed [Checo] arrive in the Accord. [Checo] and a small child exited the Accord and entered" the Target Location. <u>Id.</u> at ¶ 18. While the <u>Second Hardie Affidavit</u> [Doc. No. 52-5] did not provide information about where Checo stopped prior to arriving at the Target Location, omission of the specific stops is

_____

July 17, 2019 search does not exist without the evidence obtained pursuant to the two previous warrants. <u>See</u> Mot. to Suppress Evidence 14 [Doc. No. 52].

not material where there was no indication that Checo traveled directly to the Target Location after the money drop-off.

      2.     Probable Cause

Checo contends that the Second Hardie Affidavit [Doc. No. 52-5] fails to establish a sufficient nexus between Checo's alleged criminal activity and the Target Location to support probable cause for the July 17, 2019 search warrant of the Target Location. Mot. to Suppress Evidence 17 [Doc. No. 52]. Checo contends that the affidavit does not allege that Checo came directly from or returned to the Target Location for the June 24, 2019 money drop-off and the affidavit lacks facts suggesting that Checo had previously trafficked drugs over a long period of time or in large quantities. Id. at 18. With respect to July 1, 2019, Checo contends that her trip to New York is not sufficient to establish the necessary connection of criminal activity to the Target Location where the affidavit does not include that Checo left directly from or returned directly to the Target Location nor provides facts as to what Checo did in New York, who she visited (if anyone), and what she brought with her or returned with from her trip. Id. at 18–19.

Checo relies heavily on United States v. Roman, where the First Circuit acknowledged that it has previously "rejected a per se rule automatically permitting the search of a defendant's home when he has engaged in drug activity," and "expressed skepticism that probable cause can be established by the combination of the fact that a defendant sells drugs and general information from police officers that drug dealers tend to store evidence in their homes." 942 F.3d 43, 51–52 (1st Cir. 2019) (internal quotation marks omitted). In Roman, the First Circuit went on to state that "'generalized observations'. . . should be 'combined with specific observations,' or facts 'connecting the drug dealing to the home' to permit an inference of nexus to a defendant's residence." Id. at 52 (quoting Ribeiro, 397 F.3d at 50–52). "Examples of such specific

observations include evidence that drug distribution was being organized from [the defendant's] residence, that the defendant used his home as a communications hub for drug activity, or that the defendant move[d] back and forth from his residence in relation to drug transactions." Id. (internal quotation marks and citations omitted) (alterations in original).

The government contends that the Second Hardie Affidavit [Doc. No. 52-5] "set forth facts allowing the [m]agistrate [j]udge to conclude that Checo was a member of a large-scale drug distribution organization." Opp'n 16 [Doc. No. 62]. However, with respect to the "nexus" element, "[t]he inquiry is not whether 'the owner of the property is suspected of crime' but rather whether 'there is reasonable cause to believe that the specific things to be searched for and seized are located on the property to which entry is sought.'" Roman, 942 F.3d at 51 (quoting Zurcher v. Stanford Daily, 436 U.S. 547, 556 (1978)). The only information in the Second Hardie Affidavit [Doc. No. 52-5] bearing on the nexus between Checo's alleged criminal activity and the Target Location is that Checo "left the [Target Location] at approximately 2:45 a.m. on July 17, 2019, and traveled to New York, New York" for three hours "and then returned Massachusetts at approximately 11:56 a.m." Second Hardie Aff. ¶ 20 n.1 [Doc. No. 52-5]. Agent Hardie stated that based on her training and experience, "traveling to New York from Massachusetts and remaining there for only three hours before returning to Massachusetts is consisted with the delivery of drug proceeds and/or receipt of drugs." Id.

As support for its position, the government cites United States v. Feliz, 182 F.3d 82 (1st Cir. 1999), in which the First Circuit reversed the district court and held that an affidavit did establish probable cause to search a drug dealer's residence, despite the lack of direct evidence implicating the residence in dealing. However, the First Circuit in Roman characterized Feliz's holding as applying to "narrow circumstances . . . absent such specific facts" where "the affidavit

14

established the defendant was 'a long-time, successful, drug trafficker,' identified '[n]o other residence or drug-dealing headquarters,' and contained a statement from a law enforcement affiant that drug traffickers commonly keep drug-related evidence at their homes." Roman, 942 F.3d at 52 (quoting Feliz, 182 F.3d at 87–88). "The court found [in Feliz that '[i]n sum, the affidavit contained substantial, detailed information indicating that [the defendant] had engaged in illegal drug trafficking for at least twelve years,' supporting the conclusion that 'Feliz's drug trafficking was of a continuous and ongoing nature.'" Id. (quoting Feliz, 182 F.3d at 87). "The affidavit [in Feliz] also identified '[n]o other residence or drug-dealing headquarters of [the defendant's],' supporting the inference that a 'likely place to seek to find incriminating items' would be his home." Id. (quoting Feliz, 182 F.3d at 87).

This case is more akin to Roman where the Second Hardie Affidavit [Doc. No. 52-5] "offers no evidence pertaining to the length of [Checo's] involvement with drug trafficking in general or the [drug] organization [being investigated] in particular." Id. at 53. "Nor does it suggest that [Checo] had any prior drug-related criminal convictions or that any drug activity had been conducted from the residence." Id. "The affidavit also does not offer corroboration through law enforcement surveillance, other informants, or any other source, of CS's statement that [Checo] was a 'close criminal associate' of [the drug organization] or 'overs[aw] the narcotics' operation." Id. (citing United States v. Keene, 341 F.3d 78, 81–82 (1st Cir. 2003)).

This case does diverge from Roman in a material way, however. In Roman the "affidavit supported warrant applications for several other locations purportedly connected to the organization" and thus "any inference that could permissibly be drawn from [the defendant's] status as a drug dealer regarding the location of evidence [was] significantly weakened where . . . it [was] more likely that such evidence would be found at the residence or business of another

15

individual . . ." Id. (internal quotation marks omitted). However, even taking this difference into account, the court finds Roman's reasoning instructive. Where the only specific observation was Checo's departure on July 17, 2019, from the Target Location to travel to New York, there were insufficient facts to show a nexus between Checo's criminal activity and the Target Location.

Accordingly, the court finds that the Second Hardie Affidavit [Doc. No. 52-5] did not provide sufficient basis for probable cause to search the Target Location.[5]

3.      Good-Faith Exception

The government contends that even if the court were to find no probable cause exists as to the July 17, 2019 search warrant, the evidence obtained pursuant to the search warrant for the Target Location remains admissible under the "good faith" exception to the Fourth Amendment's exclusionary rule. Opp'n 19 [Doc. No. 62].

"The Supreme Court has clearly delineated the bounds of the good faith exception. Suppression remains appropriate: 1. '[I]f the magistrate or judge in issuing a warrant was misled by information in an affidavit that the affiant knew was false or would have known was false except for his reckless disregard of the truth.' 2. '[W]here the issuing magistrate wholly abandoned his judicial role.' 3. Where the executing officer relies 'on a warrant based on an affidavit 'so lacking in indicia of probable cause as to render official belief in its existence entirely unreasonable.''" United States v. Levin, 874 F.3d 316, 322 (1st Cir. 2017) (quoting United States v. Leon, 468 U.S. 897, 923 (1984)). "Furthermore, '[t]he Leon good faith exception does not apply where . . . a warrant . . . is 'so facially deficient—i.e. in failing to

_____

[5] The facts set forth in Section III below occurred while Agent Hardie was obtaining the warrant, or after the warrant was obtained, and according were not included in the Second Hardie Affidavit, which the magistrate judge relied upon in determining that probable cause existed for the search and seizure warrant of the Target Location.

particularize the place to be searched or the things to be seized—that the executing officers cannot reasonably presume it to be valid.'" Id. (quoting United States v. Woodbury, 511 F.3d 93, 99 (1st Cir. 2007) (further citations omitted).

Checo contends that the good faith exception does not apply here for two reasons: (i) Agent Hardie omitted information about Checo's whereabouts after the June 24, 2019 money delivery and (ii) the Second Hardie Affidavit [Doc. No. 52-5] is so lacking in indicia of probable cause that reliance on the search warrant would be unreasonable. Def.'s Supp. Mem. 8 [Doc. No. 67].[6] With respect to unreasonable reliance, Checo essentially reasserts her argument that there was an insufficient nexus between the alleged criminal activity and the Target Location due to lack of specific observations by law enforcement. Id. at 10. "Though the facts connecting that activity to the [Target Location] were insufficient to support a probable cause finding, the [c]ourt does not find that [Second Hardie] Affidavit was so obviously deficient as to make the agents' reliance on the warrant unreasonable." United States v. Mubarak, 2022 WL 2971881, at *9 (D. Mass. July 27, 2022). While the Second Hardie Affidavit [Doc. No. 52-5] "may have fallen short for the purposes of a probable cause showing" for the Target Location, "it did offer more than the hypothetical 'bare bones' statement of conclusory allegations contemplated by Leon." Id. (citing Leon, 468 U.S. at 926).

Accordingly, the evidence obtained pursuant to the July 17, 2019 search warrant for the Target Location is admissible where the agents in question relied upon it in good faith.[7]

_____

[6] The court addressed Checo's first point above in finding that a Franks hearing is not warranted on omission of where Checo specifically stopped after the June 24, 2019 money delivery.

[7] Checo contends that drugs were seized from Checo's daughter's closet prior to the issuance of the warrant, such that the good faith exception does not apply. Def.'s Supp. Mem. 11 [Doc. No. 67]. The court need not determine whether agents seized the drugs in Checo's daughter's closet prior to the issuance of the warrant where drugs from the other closet were seized pursuant to the

### III.     July 17, 2019 Interrogation and Events at Checo's Apartment

A.     *Factual Background*

While Agent Jill Hardie was obtaining the warrant, Boston Task Force ("BTF") officers went to the parking lot outside of 311 Lowell St. At approximately 12:45 p.m., a BTF officer observed a transportation van arrive at 311 Lowell St. and a female passenger matching Checo's description exit the van and enter the building. Jill Hardie Report of Investigation ¶ 3 [Doc. No. 52-7]. The officer noted that Checo had a large purse with her and no other luggage. Id.

At approximately 1:30 p.m., Checo exited Building 2, and began walking towards her vehicle in the parking lot. Hyde Aff. ¶ 2 [Doc. No. 62-4]. Agent Michael Dunn and Officer James Griffin approached Checo on foot. Id. Officer Hyde exited his vehicle, parked in the parking lot of 311 Lowell Street, and approached Checo from another direction. Id.

As the officers approached her, Checo began screaming "Daniel" as she looked up towards the balcony of Unit 2. Id. at ¶ 3. Because the persons inside the apartment had been alerted to the officers' presence, approximately five or six officers entered the building to secure Checo's apartment.

Officer Hyde requested that Checo get into his car with him so they could talk. Id. at ¶ 3. Hyde got into the driver's seat of his car, and Checo got into the back seat of the car, directly behind the driver's seat. Id. Checo was not frisked or searched before she entered Officer Hyde's car. Id. Checo's purse, which contained money and her cellular phones, was taken away from her. Affidavit of Ana Checo ("Checo Aff.") ¶ 4 [Doc. No. 52-10].[8]

---

warrant and, as discussed below, the drugs found in Checo's daughter's closet are admissible under the inevitable discovery doctrine.

[8] Although in his affidavit, Officer Hyde states that "no one took a handbag or telephone from [Checo] before she entered [his] car," Hyde Aff. ¶ 3 [Doc. No. 62-4], at the April 10, 2023

After Checo entered Hyde's car, Hyde repositioned the car in the parking lot to be out of the view of Checo's apartment as a safety precaution. Hyde Aff. ¶ 4 [Doc. No. 62-4]. Hyde explained to Checo that he and other agents were conducting a drug investigation and wanted to speak with her in connection with it. Id. at ¶ 5. Officer Hyde gave Checo her Miranda rights in English, id., which, according to Hyde's testimony at the April 10, 2023 evidentiary hearing, included:

> You have the right to remain silent. Anything you say can and will be used against you in a court of law. You have the right to an attorney. If you can't afford an attorney, one will be appointed for you at no cost. You also have the right to waive the right to remain silent and make any statement you wish. At any point in time during questioning you wish to cease answering questions and consult with an attorney, you have that right as well.[9]

Officer Hyde asked Checo if she understood what he had told her and Checo stated that she did. Id. at ¶ 5.

Officer Hyde asked Checo if there were any drugs in her apartment, and Checo replied that there were eight kilograms of drugs in her daughter's bedroom closet and described where the closet was located. Id. at ¶ 6. At that time, Officer Hyde contacted Agent Dunn, who got into the right passenger's seat of the car. Id. Hyde and Dunn again questioned Checo about whether there were drugs in her apartment and Checo confirmed that there were. Id. Checo agreed to

---

evidentiary hearing Officer Hyde testified that he does not recall Checo having a purse with her at that time because he personally did not search it or see it.

[9] Although Checo's affidavit states that while she was seated in Officer Hyde's car no one told her that she had the right to remain silent or gave her any other legal warning before she answered their questions, Checo Aff. ¶ 6 [Doc. No. 52-10], the court attributes little weight to her testimony where Officer Hyde's testimony is otherwise unrebutted and Checo has not been cross-examined on her testimony.

accompany Officer Hyde and Agent Dunn inside the apartment to point out where the drugs were stored. Id.

When Checo, Hyde, and Dunn entered the apartment, other agents and DEA Task Force Officers were present. Id. at ¶ 7. Checo's relatives were unrestrained in the open living/dining/kitchen area of the apartment conversing with one another. Id.

Once inside the apartment, Checo showed Officers Shawn Cayer and Hyde where the drugs in her daughter's bedroom closet were located. Id. at ¶ 8.[10] Officer Hyde asked Checo in English if she remembered the Miranda rights that he had previously provided to her, and Checo stated that she did. Id. Then, Checo and Officer Hyde sat on the couch in the open common space of the apartment to await the issuance of the search warrant. Id. at ¶ 9. While sitting there, Checo told Officer Hyde that she had picked up twelve kilograms of drugs in New Jersey previously and had gone to New York that morning to deliver $100,000, which was payment for five kilograms of drugs sold. Id.

At approximately 2:00 p.m., Agent Hardie notified officers on scene that she had obtained a search warrant for the Target Location. Id. at ¶ 10. At that point, agents and officers searched Checo's apartment and located eight additional kilograms of drugs in Checo's bedroom closet. Id. Checo admitted that she had retrieved 22 kilograms of drugs in New Jersey and transported them back to her apartment. Id. During the search, agents also located an air compressor. Id. at ¶ 11. When asked about the air compressor, Checo showed the agents how to

_____

[10] Officer Hyde provided conflicting testimony as to whether Officer Cayer retrieved the drugs in Checo's daughter's bedroom closet at that point or waited until receiving word that the search warrant was signed.

open a hidden compartment, which was empty. Id. Checo stated that the air compressor was going to be sent to the Dominican Republic. Id.

Agent Hardie arrived at the apartment and provided Checo a copy of the search warrant for Checo's apartment. Id. at ¶ 12. The search warrant was in English and Agent Hyde asked Checo to read aloud the top lines of the search warrant, which Checo did. Id. According to Agent Hardie's testimony at the April 10, 2023 evidentiary hearing, Hardie told Checo that the officers were interested in her cooperation and asked if Checo would give consent for her phone to be searched. Checo agreed and signed a consent to search form in Spanish for her cellphone. Agent Hardie and Checo looked through the contents of Checo's phone together, and Checo showed Hardie the text thread between Checo and the man who the drugs belonged to. Agent Hardie and Checo discussed further Checo's morning travel to New York.

At some point after Agent Hardie arrived, Checo's relatives left the apartment, but Checo did not leave with them.

Agent Hardie advised Checo that she was not being arrested, but that Checo should get an attorney and have that attorney call Hardie so that they could sit down with the prosecutor to discuss Checo's cooperation. Checo said that she understood. Within a day of the search, an attorney on behalf of Checo contacted Agent Hardie.[11]

_____

[11] Despite this contact, no cooperation occurred.

B.    *Discussion*

1.    Statements Made by Checo

Checo moves to suppress statements she made on July 17, 2019 to law enforcement on the grounds that those statements were made without a knowing and intelligent waiver of her Miranda rights. Mot. to Suppress Statements [Doc. No. 53].

"The Supreme Court developed the Miranda rules as a prophylactic measure to dissipate the coercion inherent in the custodial interrogation setting, with a goal of ensuring that any statements made by a suspect are truly the product of free choice and consistent with the Fifth Amendment to the United States Constitution. United States v. Molina-Gomez, 781 F.3d 13, 21 (1st Cir. 2015) (internal quotation marks omitted). "Accordingly, [i]t is well established that Miranda warnings must be communicated to a suspect before he is subjected to custodial interrogation." Id. (internal quotation marks omitted). "Both 'custody' and 'interrogation' must be present to require Miranda warnings." Id.

a.    Custody

The government contends that Checo was not in custody at the time that she spoke with law enforcement officers where (i) Checo encountered the officers in a parking lot outside of her apartment, (ii) she was not searched before entering Officer Hyde's car, (iii) she was not restrained while inside the car, (iv) she initially spoke with only Officer Hyde; (iv) Hyde did not have his weapon visible; and (vi) her initial conversation in Hyde's car was brief. Opp'n 21 [Doc. No. 62].

"Custody exists where there is 'a formal arrest or restraint on freedom of movement of the degree associated with a formal arrest.'" Molina-Gomez, 781 F.3d at 21 (quoting United States v. Fernández–Ventura, 85 F.3d 708, 710 (1st Cir.1996) (internal quotation marks and

citations omitted)). "In determining whether a person is in custody in this sense, the initial step is to ascertain whether, in light of the objective circumstances of the interrogation a reasonable person would have felt he or she was not at liberty to terminate the interrogation and leave." Howes v. Fields, 565 U.S. 499, 509 (2012) (internal quotation marks and citations omitted). Other "relevant considerations in a custody determination include, but are not limited to, 'whether the suspect was questioned in familiar or at least neutral surroundings, the number of law enforcement officers present at the scene, the degree of physical restraint placed upon the suspect, and the duration and character of the interrogation.'" Molina-Gomez, 781 F.3d at 21 (quoting Fernández–Ventura, 85 F.3d at 710).

Considering the objective circumstances, the court finds that a reasonable person would not have felt at liberty to leave the conversations that took place between Checo and various agents and officers on July 17, 2019. When Checo exited her home, she was approached by two officers on one side and Officer Hyde on the other. As Checo yelled towards the balcony of her apartment, several officers went into her apartment to secure it. Although Checo was not frisked or searched in the parking lot, at Officer Hyde's direction Checo entered the back of Hyde's vehicle. Officer Hyde testified that he did not lock the doors of his car when Checo got in the backseat[12] and that she was not restrained, however Hyde repositioned the car in the parking lot without explaining to Checo what he was doing. At the beginning of their conversation, Officer Hyde told Checo that he and the other officers were conducting a drug investigation and wanted to speak to her in connection with it. While Checo was initially speaking to only Officer Hyde, Agent Dunn got into Hyde's car to hear Checo's answers. The conversation in Officer Hyde's

---

[12] However, it remains unclear whether Checo sitting in the backseat of the car would have been able to open the doors from the inside.

car was relatively brief, but it continued as Hyde, Checo, and Dunn exited the car and went into Checo's apartment.

The government further contends that Checo was not in custody when she went inside her apartment with Officer Hyde and Agent Dunn because Checo was in a familiar setting, was not separated from her family, and was not restrained or prohibited from moving about her apartment. Opp'n 22 [Doc. No. 62]. However, Checo, Hyde, and Dunn went to Checo's apartment so Checo could show them where the drugs were located in her daughter's bedroom closet. When they entered Checo's apartment, it was secured by several agents and officers. After locating the drugs in her daughter's bedroom closet, Checo answered Hyde's questions as they sat on the living room couch waiting for the search warrant to be executed. Checo did not depart with her relatives when they left her apartment.

The court finds the First Circuit's reasoning in United States v. Rogers, 659 F.3d 74 (1st Cir. 2011) instructive. In that case, the court of appeals found that the defendant had been in custody where defendant "arrived home to find three officers in control of his house under the authority of a warrant, questioning his pregnant wife." Rogers, 659 F.3d at 78. The First Circuit noted that "[t]he test [for custody] must thus be adjusted to look for a sense of freedom to limit conversation that would have been felt by someone with liberty to depart, and while a suspect questioned on his premises during a search does not necessarily lack that freedom, [the defendant] would naturally have felt close to the limit of voluntary action. He received no indication that he could avoid the officers then in control of his dwelling, and although he was told that he would not be arrested and taken away, he was not advised that he was free to have nothing to do with the enquiring police officers while they were there." Id. Similarly, here, where Officer Hyde informed Checo of an ongoing drug investigation as she sat in the backseat of his

car, and Checo waited with Hyde for the search warrant for her apartment to be signed, it cannot

be said that a reasonable person would have a sense of liberty to leave the conversation or the

premises.

Based on the totality of the circumstances, the court finds that Checo was in custody on

July 17, 2019.[13]

Accordingly, the court finds that Checo was subject to custodial interrogation.

b.      Waiver

The government contends that Checo waived her <u>Miranda</u> rights where Officer Hyde

provided them to her, Checo orally affirmed that she understood her rights, and she proceeded to

answer Hyde and other officers' questions. Checo contends that her English is inadequate such

that she could not understand the <u>Miranda</u> rights that Officer Hyde provided to her.

"Determining the validity of a <u>Miranda</u> waiver usually entails two separate inquiries. The

waiver must be both voluntary, and knowing and intelligent." <u>United States v. Bezanson-Perkins</u>,

390 F.3d 34, 39 (1st Cir. 2004). "A waiver is voluntary when 'it [is] the product of a free and

deliberate choice rather than intimidation, coercion, or deception.'" <u>Id.</u> (quoting <u>Moran v.</u>

<u>Burbine</u>, 475 U.S. 412, 421 (1986) (alterations in original)). "A waiver is knowing and

intelligent when 'made with a full awareness of both the nature of the right being abandoned and

the consequences of the decision to abandon it.'" <u>Id.</u> (quoting <u>Moran</u>, 475 U.S. at 421). "Both

inquiries are judged based on the 'totality of the circumstances surrounding the interrogation,'"

<u>id.</u> at 39–40 (quoting <u>Moran</u>, 475 U.S. at 421), and "the particular case, 'including the

background, experience, and conduct of the accused[,]'" <u>United States v. Garcia</u>, 983 F.2d 1160,

---

[13] The government does not contend that the questioning of Checo on July 17, 2019, did not
constitute an interrogation.

1169 (1st Cir. 1993) (quoting <u>North Carolina v. Butler</u>, 441 U.S. 369, 374–75 (1979)). "An inquiring court must start with a presumption that the suspect did not waive his rights, and the government bears the burden of showing the validity of the waiver by a preponderance of the evidence." <u>United States v. Carpentino</u>, 948 F.3d 10, 26 (1st Cir. 2020).

<blockquote>i.      Expert Testimony</blockquote>

At the April 10, 2023 evidentiary hearing, Checo proffered the opinion of Dr. Robert Mendoza, a forensic psychologist, as to what a person with Checo's level of English language comprehension could understand about the legal rights that were provided to her on July 17, 2019. Dr. Mendoza's evaluation of Checo consisted of four phases: (1) general psychosocial evaluation in Spanish; (2) neuropsychological testing in Spanish; (3) neuropsychological testing in English; and (4) discussion of general <u>Miranda</u> rights waivers in Spanish.[14]

For the first phase—general psychosocial evaluation—Dr. Mendoza interviewed Checo regarding her personal history and relied upon Checo's social media accounts and records supplied by Checo's attorney. For the second and third phase—neuropsychological testing—Dr. Mendoza conducted a battery of tests, including but not limited to tests of IQ, memory, vocabulary, and reading comprehension. Dr. Mendoza administered certain tests designed to detect whether a person is intentionally feigning lack of ability. At stage four—discussion of <u>Miranda</u> rights—Dr. Mendoza asked Checo questions about <u>Miranda</u> rights and her general understanding of those rights. Dr. Mendoza testified that based on Checo's test results, Checo's reading comprehension in English is that of a six- or seven-year-old child, and that she would not

---

[14] The examination was conducted primarily in Spanish and the English portions related only to specific English language tests.

have comprehended the <u>Miranda</u> warnings, which are generally written at a sixth or seventh grade level, as provided by Officer Hyde.

At the outset, "[t]he court must decide any preliminary question about whether a witness is qualified[.]" Fed. R. Evid. 104(a). A witness "qualified as an expert by knowledge, skill, experience, training or education" may offer expert testimony only if (a) "the expert's scientific, technical or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue;" (b) "the testimony is based on sufficient facts or data;" (c) the testimony is the product of reliable principles and methods; and (d) "the expert has reliably applied the principles and methods to the facts of the case." Fed. R. Evid. 702. The party proffering expert testimony must show, by a preponderance of the evidence, that the testimony satisfies the requirements of Rule 702. <u>See</u> <u>Bricklayers & Trowel Trades Int'l Pension Fund v.</u> <u>Credit Suisse Secs. (USA) LLC</u>, 752 F.3d 82, 96 (1st Cir. 2014). Courts have a "gatekeeping responsibility" to determine whether the testimony an expert seeks to offer satisfies these criteria. <u>Daubert v. Merrell Dow Pharms., Inc.</u>, 509 U.S. 579, 589 n.7, 592 n.10 (1993).

Without making determinations as to Dr. Mendoza's qualifications or the underlying test results, the court finds that Dr. Mendoza's opinion as to Checo's English language comprehension is not based on reliable methods. While Dr. Mendoza administered several tests in Spanish to detect malingering, and the results of those tests indicated that Checo was putting forth sufficient effort on those tests, no such validity check was built into any of the English-based tests Checo underwent. The court cannot find Dr. Mendoza's methods reliable where Checo may have intentionally scored lower on the tests administered to her in English.

Similarly, the court finds that Dr. Mendoza's opinion of Checo's Spanish language comprehension is not based on reliable methods where the test to detect malingering was not

built into those tests either. Moreover, to the extent that certain tests Checo took in Spanish placed her in the fifth percentile or lower, such results are inconsistent with other information Dr. Mendoza put forth regarding Checo. For instance, Dr. Mendoza testified that during the psychosocial phase, Checo told him that she completed high school, had tutoring in English, did well in her first semester of college in the Dominican Republic, never had any learning difficulty, and maintained employment in retail and in the hospitality industry.

Accordingly, the court finds that Dr. Mendoza's expert testimony as to Checo's level of English and Spanish language comprehension is not admissible.

ii.      Factual Evidence

Checo contends that the facts in existence on July 17, 2019, show that she did not have sufficient English proficiency to provide an intelligent waiver of her Miranda rights. Mot. to Suppress Statements 7 [Doc. No. 53]. Specifically, Checo contends that her communications exclusively in Spanish during the July 1, 2019 money drop-off and found in her cellphone on July 17, 2019, and Officer Hyde's provision of a reading test to her supports a finding that Checo's English was inadequate.

As an initial matter, Checo's communications in Spanish indicate only that Spanish is her preferred language, not that her English comprehension is inadequate. "It is unquestioned that language difficulty can, in some cases, render a waiver invalid." United States v. Hristov, 2010 WL 4449603, at *3 (D. Mass. Nov. 4, 2010). However, the case Checo primarily relies on— Tague v. Louisiana, 444 U.S. 469 (1980)—is inapposite. In Tague, the Supreme Court found that "no evidence at all was introduced to prove that petitioner knowingly and intelligently waived his rights before making the inculpatory statement," Tague, 444 U.S. at 471, where "the arresting officer testified that he read petitioner his Miranda rights from a card, that he could not presently

remember what those rights were, that he could not recall whether he asked petitioner whether he understood the rights as read to him, and that he 'couldn't say yes or no' whether he rendered any tests to determine whether petitioner was literate or otherwise capable of understanding his rights," Tague, 444 U.S. at 469. Here, at the evidentiary hearing, Officer Hyde recalled the Miranda rights that he provided Checo in detail, and testified that he asked Checo if she understood those rights and that Checo confirmed that she did and had no questions. When Agent Hardie arrived at the Target Location with the search warrant, Officer Hyde asked Checo to read aloud one or two paragraphs at the top of the search warrant, which Checo did successfully.

To the extent that Checo contends that the officers should have taken additional steps to confirm her English reading comprehension, no such requirement is borne out by the caselaw, particularly where Checo had communicated effectively in English throughout the interrogation and orally affirmed her understanding of the Miranda rights provided to her. "Once it is determined that a suspect[] . . . at all times knew [she] could stand mute and request a lawyer, and that [she] was aware of the State's intention to use [her] statements to secure a conviction, the analysis is complete and the waiver is valid as a matter of law." Moran, 475 U.S. at 422–23.

Checo also argues that the fact that Officer Hyde later asked her to read a portion of the search warrant in English somehow demonstrates that he was unsure of her language ability. That Officer Hyde took that extra step to try to avoid the language dispute, however, does not make more likely that Checo did not understand the Miranda rights provided to her.

Accordingly, the court finds that the totality of the circumstances shows by a preponderance of the evidence that Checo's English was adequate for a knowing and intelligent waiver of her Miranda rights.

29

Checo's <u>Motion to Suppress Statements</u> [Doc. No. 53] made by her to law enforcement on July 17, 2019, is denied.

        2.      Inevitable Discovery Doctrine

The inevitable discovery doctrine provides that evidence obtained by violating the Fourth Amendment is nevertheless admissible "[i]f the prosecution can establish by a preponderance of the evidence that the information ultimately or inevitably would have been discovered by lawful means." <u>United States v. D'Andrea</u>, 648 F.3d 1, 12 (1st Cir. 2011) (quoting <u>Nix v. Williams</u>, 467 U.S. 431, 444 (1984) (alterations in original)). The First Circuit has "identified 'three basic concerns' to keep in mind in deciding whether to apply the inevitable discovery doctrine: 'are the legal means truly independent; are both the use of the legal means and the discovery by that means truly inevitable; and does the application of the inevitable discovery exception either provide an incentive for police misconduct or significantly weaken fourth amendment protection?'" <u>Id.</u> (quoting <u>United States v. Silvestri</u>, 787 F.2d 736, 744 (1st Cir. 1986)). "In this Circuit, there is no requirement that the independent line of investigation that would have led to the inevitable discovery be already underway at the time of the illegal discovery." <u>Id.</u> (quoting <u>Silvestri</u>, 787 F.2d at 746).

Checo contends that the inevitable discovery doctrine is not applicable to evidence found in the Target Location because it would weaken Fourth Amendment protections while incentivizing police misconduct. Def.'s Supp. Mem. 2 [Doc. No. 74].[15] Specifically, Checo points to Officer Hyde's <u>Affidavit</u> [Doc. No. 62-4], in which he states that "Checo [] showed

---

[15] The court does not focus on the first and second concern—(i) the legal means are truly independent and (ii) the use of the legal means and the discovery by that means are truly inevitable—where Checo does not raise those concerns and the July 17, 2019 search warrant application of the Target Location does not rely on the events of July 17, 2019 afternoon.

Task Force Officer [Cayer] and [himself] to [Checo's] daughter's bedroom closet and pointed

out a bag that she stated contained the kilograms of drugs" prior to "Special Agent Jill Hardie

notif[ying] officers on scene that she had obtained a search warrant for the apartment." Hyde

Aff. ¶¶ 8-9 [Doc. No. 62-4]. As Checo views it, "[r]ather than admit the search occurred before

the search warrant was authorized, officers repeatedly wrote that the original seven packages of

drugs were found <u>during</u> the execution of the search warrant." Def.'s Supp. Mem. 2 [Doc. No.

74] (emphasis in original). Therefore, "where a material representation was made regarding the

acquisition of evidence, inevitable discovery should not apply." <u>Id.</u> at 3.

   While Checo proffers one explanation as to why all of the investigative reports filed

within days of the search and Agent Hyde's recollection of the sequence of events more than

three years later differ, there are certainly others. Importantly, "the record shows that the [agents]

had no incentive to transgress [Checo's] constitutional rights in order to resort to the inevitable

discovery doctrine" and "[t]hat lack of incentive deserves weight in considering the third prong

of the test." <u>United States v. Hughes</u>, 640 F.3d 428, 441 (1st Cir. 2011). Even if Checo had

shown Officer Hyde the drugs located in her daughter's closet prior to the execution of the

search warrant, at that point law enforcement had already secured the Target Location in

anticipation of the signed warrant. Moreover, there is no dispute that Checo and Officer Hyde

"then sat on the couch in the open living/dining/kitchen area of the apartment to await issuance

of the search warrant for the residence." Hyde Aff. ¶ 9 [Doc. No. 62-4]. Accordingly, the court

finds that "invocation of the inevitable discovery doctrine would not affect the core values of the

Fourth Amendment." <u>Hughes</u>, 640 F.3d at 441.

   Checo further contends that even if the inevitable discovery doctrine is applicable to the

search of the Target Location, it does not apply to her cellular telephone where the search

warrant did not authorize seizure of items on Checo's person and her purse (and phone which was inside) were seized when she was entering Agent Hyde's car outside of the Target Location. Def.'s Supp. Mem. 4 [Doc. No. 74]. Checo's argument that the government "[cannot] prove by a preponderance of the evidence that her phone would have been seized in a lawful manner if the violation had not occurred" fails where from the moment when Checo's purse was seized, she sat in Officer Hyde's car and then reentered the Target Location prior to and remained for the duration of the search. Nothing in the record indicates that Checo's purse was searched outside of the Target Location or that Checo would have kept her purse outside of the Target Location prior to the commencement of the search.[16]

Accordingly, to the extent that the drugs found in Checo's daughter's closet and Checo's cellphone located in her purse were seized prior to the execution of the search warrant, the inevitable discovery doctrine applies.[17]

## IV.   Conclusion

For the foregoing reasons, Checo's <u>Motion to Suppress Evidence</u> [Doc. No. 52] and <u>Motion to Suppress Statements</u> [Doc. No. 53] are DENIED.

IT IS SO ORDERED.

April 26, 2023                          /s/ Indira Talwani
                                        United States District Judge

---

[16] Moreover, when inside the apartment Checo signed a Spanish-language written consent waiver permitting the search of her cellphone. <u>See</u> Ex. H., Signed Consent Waiver [Doc. No. 79-1].

[17] Where the drugs found in Checo's daughter's closet are admissible under the inevitable discovery doctrine, the court need not address the government's argument that agents seized the drugs pursuant to Checo's valid consent. Opp'n to Def.'s Supp. Mot. to Suppress Evidence 2 [Doc. No. 70].